**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| Big Cat Rescue Corp., a Florida not-for-profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-2016-0155-SLP |
| Shirley M. Schreibvogel, an individual, and Greater Wynnewood Development Group, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S CORRECTED MOTION FOR SUMMARY JUDGMENT,**
**AND BRIEF IN SUPPORT**

Melvin R. McVay, Jr., OBA No. 6096
Heather L. Hintz, OBA No. 14253
Juston R. Givens, OBA No. 19102
PHILLIPS MURRAH P.C.
101 N. Robinson Avenue, Thirteenth Floor
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-4100
Facsimile: (405) 235-4133
mrmcvay@phillipsmurrah.com
hlhintz@phillipsmurrah.com
jrgivens@phillipsmurrah.com

**ATTORNEYS FOR PLAINTIFF,**
**BIG CAT RESCUE CORP., a Florida not-**
**for-profit corporation**

# **TABLE OF CONTENTS**

I.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS ......................... 1

    A.   History of Zoo 1 and its successor, Zoo 2, and the judgments
        against them .................................................................................. 1

    B.   Soon after its creation, Zoo 2 began transferring Zoo 2 funds
        to Shirley Schreibvogel ................................................................ 3

    C.   Schreibvogel actively assisted Zoo 2 and Maldonado in placing
        assets beyond the reach of creditors to render the Judgments
        uncollectible ................................................................................. 7

        The Zoo Land ................................................................................ 7

        The Four Vehicles ......................................................................... 9

        Portable Buildings ...................................................................... 12

    D.   The creation of and further fraudulent transfers to Greater
        Wynnewood Development Group, LLC ...................................... 13

II.   ARGUMENT AND AUTHORITIES ................................................... 15

    A..   BCR is entitled to a constructive trust on the Zoo Land, the
        4 Vehicles and Portable Buildings ............................................. 15

    B.   Plaintiff is entitled to an equitable lien on the Zoo Land, the
        4 Vehicles and the Portable Buildings ....................................... 20

    C.   BCR is entitled to summary judgment on its fraudulent transfer
        claims against Shirley Schreibvogel and GWDG ....................... 22

        1.   GW Zoo transferred $30,000 in donor funds to
            Schreibvogel with the intent to hinder, delay, or defraud
            BCR, and, therefore, constitutes a fraudulent transfer
            with actual fraud pursuant to 24 O.S. § 116(A)(1). ......................... 22

            a.   There was a transfer of the $30,000 in donor funds ............. 23

i

       b.     Zoo 2 transferred the $30,000 to Schreibvogel with the actual intent to hinder, delay, or defraud BCR ................... 23

    2.    Zoo 2 transferred assets to Schreibvogel without receiving reasonably equivalent value in exchange, and at the time of the transfer, Zoo 2 was insolvent. This constitutes a fraudulent transfer with constructive fraud as to Plaintiff, pursuant 24 O.S. § 116(A)(2) ..........................25

III.    PRAYER FOR RELIEF ........................................................................ 26

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Caldwell v. Armstrong*, 342 F.2d 485 (10th Cir. 1965)......................................................... 20

*Commodity Futures Trading Comm'n v. Hudgins*,
    620 F. Supp. 2d 790 (E.D. Tex. 2009) ................................................................. 21

*Delk v. Markel Am. Ins. Co*., 2003 OK 88, 81 P.3d 629 ..................................................... 15

*Farm Credit Bank of Wichita v. Woodring*, 1993 OK 52, 851 P.2d 532 .......................... 22

*Goldsby v. Juricek*, 1965 OK 101, 403 P.2d 454 ............................................................... 17

*In re Dwyer*, 250 B.R. 472 (Bankr. D. RI. 2000) ............................................................... 22

*In re Maloney-Crawford*, 144 B.R. 531 (Bankr. N.D. Okla. 1992) .................................. 17

*In re Pardee*, 433 B.R. 377 (Bankr. N.D. Okla. 2010) ...................................................... 16

*In re Seneca Oil Co.*, 76 B.R. 810 (W.D. Okla. 1985)........................................................ 20

*In re Seneca Oil Co*., 906 F.2d 1445 (10th Cir. 1990) ....................................................... 16

*Nichols v. Nichols,* 2009 OK 43, 222 P.3d 1049 ............................................................... 15

*Okla. Dep't of Sec. ex rel. Faught v. Blair*, 2010 OK 16, 231 P.3d 645 ........................... 15

*Payne v. Gilmore*, 1963 OK 26, 382 P.2d 140 ................................................................... 25

*Peyton v. McCaslin*, 1966 OK 4, 417 P.2d 316................................................................... 17

*Phillips v. Ball,* 1960 OK 145, 358 P.2d 193 ....................................................... 15, 17, 20

*Rural Water Dist. No. 5 v. City of Coweta*,
    202 F. Supp. 3d 1268, 1271 (N.D. Okla. 2016) ............................................... 16, 18

## <u>Statutes</u>

24 O.S. § 113(12) ................................................................................................................ 23

24 O.S. § 114(A)................................................................................................................. 25

24 O.S. § 116(A)(1) ................................................................................. 23

24 O.S. § 116(A)(2) ................................................................................. 25

24 O.S. § 116(B) ...................................................................................... 24

24 O.S. § 116(B)(1-11) ............................................................................ 24

24 O.S. § 117(A) ...................................................................................... 22

24 O.S. § 119(A)(1) ................................................................................. 22

## **Other Authority**

Oklahoma's Uniform Fraudulent Transfer Act ............................................. 22, 23, 24, 28

**PLAINTIFF'S CORRECTED[1] MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 56, plaintiff Big Cat Rescue Corp. ("BCR") moves for summary judgment against defendants Shirley M. Schreibvogel ("Schreibvogel") and Greater Wynnewood Development Group, LLC ("GWDG") and - states:

**I.     STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

**A.     History of Zoo 1 and its successor, Zoo 2, and the judgments against them.**

1.     Founded in 1999 by Joseph Maldonado ("Maldonado") together with his parents, Shirley and Francis Schreibvogel, Greater Wynnewood Exotic Animal Memorial Foundation ("Zoo 1") owned and operated an exotic animal park in Wynnewood, Oklahoma. Maldonado was Zoo 1's President and principal figure. *See* Ex. 1 (Feb. 2, 2016 Mem. Op. and Order, Case No. cv-377-SLP (W.D. Okla.) [Doc. 183] at 1-2).

2.     BCR is a Florida not-for-profit corporation with its principal place of business in Tampa, Florida. On February 8-14, 2013, BCR obtained civil consent judgments exceeding $1 million and permanent injunctions (the "Judgments") against Zoo 1 and Maldonado in three civil proceedings in the United States District Court for the Middle District of Florida. *See id.*

---

[1] Per the Court's instructions, this Corrected Motion for Summary Judgment is filed to substitute exhibit identification numbers and exhibit pages that were incorrect due to technical and electronic case filing problems. The Sealed Exhibits [Doc. No. 98] and the Notice of Conventional Filing [Doc. No. 99] with regard to Exhibit 38 still pertain to this corrected filing.

3.      Immediately after entry of the Judgments against Zoo 1, Maldonado orchestrated its dissolution. He created The Garold Wayne Interactive Zoological Foundation ("Zoo 2") under a fiction claiming it was a separate entity, free from the Judgments, over which he wholly lacked governance authority and from which he received no income.[2] He filed chapter 7 bankruptcies for himself and Zoo 1 to wash away the Judgments. See Ex.2 (BCR's Motion for Partial Summary Judgment, Case No. cv-377-SLP (W.D. Okla.) [Doc.141]) at 13, SUF ¶¶ 19, 22. So confident was Maldonado, that he aired a video in which he publicly announced he had out-foxed BCR and would prevent it from collecting on its Judgments, while continuing to operate the Wynnewood animal park without consequence. See Ex.2 at 14, ¶ 27.

4.      Zoo 2 began operation of the Wynnewood animal park on or about February 25, 2013. Ex. 2 at 23, ¶ 3. It did not assume any of Zoo 1's liabilities. See Ex.1 at 3.

5.      Zoo 2 opened a checking account at International Bank of Commerce ("IBC") bearing account number x693 on February 21, 2013. See Ex.3 (excerpts of Zoo2 IBC. Recds) at IBC-GWZOO-000002, et seq. On December 17, 2013, Zoo 2 opened a

---

[2] The Court determined these facts in a prior, related case, in which, on February 2, 2016, the Court granted BCR's Motion for Partial Summary Judgment ("2015 MSJ"). See Case No. cv-14-377-SLP (W.D. Okla.) (the "Successor Liability/Fraudulent Transfer Action") [Docs. 141, 183]. The Court concluded Zoo 2 is Zoo 1's successor and obtained all Zoo 1's assets and business operations by fraudulent transfer, and, accordingly, awarded damages in the amount of the original Judgments. [Doc. 184]. The Judgments were not appealed. Therefore, BCR's Undisputed Facts in its 2015 MSJ [Doc. 141], and Court's subsequent determinations as to the facts concerning the dissolution of Zoo 1 and creation of Zoo 2 [Doc. 183] determined in the Successor Liability/Fraudulent Transfer Action cannot be challenged.

2

checking account at Pauls Valley National Bank ("PVNB"). *See* Ex.4 (Excerpts of Zoo2 PVNB Recds) at PVNBZ2_000001, et *seq*.; Ex. 5 (Dep. Tr. J. Maldonado) at 80:13-81:23.

**B.**    **Soon after its creation, Zoo 2 began transferring Zoo 2 funds to Shirley Schreibvogel.**

6.    From 2013-2015, Schreibvogel maintained a checking account at IBC bearing account number x1180 ("IBC Acct."), and a savings account at PVNB bearing account number x067 ("PVNB Acct."). *See* Ex.6 (Excerpts of IBC Acct Recds.) at IBC-MRSS-000001, *et seq*.; Ex. 7 (PVNB Acct Recds.) at PVNB-000001, *et seq*; Ex.5 at 57:21-59:14 (Maldonado familiar with Schreibvogel's PVNB account).

7.    Schreibvogel was never a board member or employee of Zoo 2. See Ex.5 at 67:19-25; 128:14-129:14. She was not entitled to compensation from Zoo 2. *Id*. at 122:21-123:2. She did not loan money to Zoo 2. *See* Ex. 8 (Dep. Tr. of S. Schreibvogel at 94:3-13; Ex. 9 (Schreibvogel's Second Amended Responses to Interrogatories) Ans. 13. Zoo 2 has no paperwork documenting any loans between it and Schreibvogel. See Ex.5 at 77:1-78:17.

8.    Although Zoo 2 had its own bank account, beginning in 2013 it transferred funds to Schreibvogel by negotiating donor and other checks made payable to Zoo 2 directly to her without depositing them into its own accounts. *See* Ex.8 at 103:4-105:11. Among these checks were numerous checks drawn on the account of Capitol International Productions ("Capitol"). *See* Ex.5 at 58:21-59:10; 60:2-61:16: 62:8-17:

3

63:1-10;  65:2-14:  66:1-22:  68:1-21:  Ex.7  at  PVNB-000047-000079;  Ex.8  at  100:19-101:11;  103:4-104:1;  105:2-18:  106:10-16;  106:12-21.

9.      Shirley did not have a contract with Capitol and was not performing work for it. *See* Ex.5 at 67:19-22; 71:9-22. Rather, Capitol owed the money to Zoo 2 pursuant to an oral contract for a show. *See* Ex.5 at 11:6-12:17.

10.     From May 10, 2013 through August 27, 2013, Schreibvogel received and deposited into her PVNB Account at least $33,000 from eleven Capitol checks made payable to Zoo 2. *See* Ex. 5 at 58:21-59:10; *see also* SUF ¶ 8.

11.     Maldonado's friend Doug Terranova was also involved in the Capitol show through his company Terranova Enterprises. *See* Ex. 5 at 60:2-24. Schreibvogel did "not really" know who Terranova or Terranova Enterprises were. *See* Ex.8 at 103:18-104:21. She did not have a contract with Terranova and he did not owe her any funds. *See* Ex. 5 at 76:4-25; 78:15-79:3;  Ex. 7 at PVNB-000045, 000082-000119, PVNB-000123.

12.     Nevertheless, in 2014, Schreibvogel began to receive a series of checks drawn on the account of Terranova Enterprises and made payable to her, which were deposited into her accounts. *See* Ex.7 at PVNB-000082-000118; Ex. 8 at 103:23-104:21; Ex. 5 at 78:18-79-25, Although Terranova owed Zoo 2, at Maldonado's direction, it paid the money directly to Schreibvogel by checks made payable to her. *See* Ex.5 at 78:18-79:6.

13.     From January through September 2014, Schreibvogel received and deposited into her PVNB Account at least $25,000 in Zoo 2 funds by means of 18 checks written to her by Terranova, and one check of $1,328.50 written to Zoo 2 by Terranova

4

but "signed over" to her by Maldonado and deposited into her account. *See* SUF ¶ 12. Later, she deposited a Terranova Enterprises check of $500 payable to "GW Zoo" for magic prop (Joplin) and a "donation" check of $500 payable to GW Zoo into the PVNB Account on March 20, 2015 (which were deposited together with $1000 cash). *See* Ex. 7 at PVNB-000121-123.

14.     In February 2015, a donor check drawn on the account of June Rhea, for $30,000 – a donation to Zoo 2 made payable to GW Zoo – was deposited directly into Schreibvogel's PVNB Account. *See* Ex.7 at PVNB-000119-120; Ex. 8 at 111:22-112:6. Zoo 2 endorsed this check to her. *See* Ex.5 at 92:20-93:23. Schreibvogel also endorsed the $30,000 check, and deposited it into her PVNB Account the same day it was written. *See* Ex.8 at 113:3-13.ex.9

15.     The Wynnewood animal park has since its inception operated on 16.439 acres of land in Wynnewood, Oklahoma (the "Zoo Land"). *See* Ex. 2 at 13, SUF ¶ 23. Maldonado has since the late 1990's lived in a house on the Zoo Land. *See* Ex. 5 at 19:17-20:4

16.     In January 2011, the unencumbered Zoo Land was titled in Maldonado's name. However, in 2011, Maldonado deeded the Zoo Land on which Zoo 1 then operated to Schreibvogel for no consideration. *See* Ex.2 at 13, SUF ¶ 23; Ex. 10 (Feb. 1, 2011 Quitclaim Deed). Schreibvogel leased the Zoo Land to Zoo 2 under a lease dated February 22, 2013 ("2013 Lease"). *See* Ex.11. The 2013 Lease required annual lease payments of $5,0000.00. *See Id.*

5

17.    In litigation filed against her by Maldonado's Chapter 7 bankruptcy trustee alleging the transfer was a fraudulent attempt to avoid Maldonado's creditors (including BCR), Schreibvogel confessed to a $63,300 judgment. *See* Ex.12 (Trustee's Complaint to Avoid Fraudulent Transfer [BK Doc. 1], Adv. No. 13-01114-NLJ (Bankr. W.D. Okla.); Ex 13 (Notice of Acceptance of Offer of Judgment). An appraiser, who reviewed the 2013 Lease between Schreibvogel and Zoo 2, arrived at the $63,300 figure that was the basis of Schreibvogel's judgment damages after concluding the lease rate under the 2013 Lease was $5,000.00 annually. See Ex. 14 (Excerpts from Dec. 30, 2014 Appraisal Report) at GWDG 00021, 00030, 00040, 00070-74, 00084-87, 00092-93.

18.    Zoo 2 entered into a new lease with Schreibvogel on May 11, 2015 (the "2015 Lease"), which changed the annual lease payments to $38,000 per year, and by its terms would expire on May 11, 2098. *See* Ex.15 (2015 Lease)

19.    A review of Schreibvogel's tax returns appears to show that she reported no income from Zoo Land lease payments on her 2012, 2013, 2014, 2015, or 2016 federal tax returns. See Ex. 16 (2012 income tax returns) at line 17 Sch 00034-35, and Schedule E Sch 00039-43; Ex 17 (2013 income tax returns) at line 17 Sch 00142-43, and Schedule E Sch 00145-147;  Ex. 18 (2014 income tax returns) at line 17 Sch 00098-99, and Schedule E Sch 00101-103; Ex. 19 (2015 income tax returns) at line 17 Sch 00610-611, and Schedule E Sch 00613-614; Ex. 20 (2016 income tax returns) at line 17 Sch 00582-583, and Schedule E Sch 00585-586.   Yet, on the same returns, Schreibvogel reported rental income from Kansas land. See Ex. 16 at Sch 00034-35, 00039-43; Ex.17 at Sch

6

00142-43, 00145-147; Ex.18 at Sch 00610-611, 00613-614; Ex. 19 Sch 00610-611, 00613-614; and Ex. 20 Sch 00582-583, 00585-586.

20.    Likewise, no 1099 or other evidence of income paid to Schreibvogel by Zoo 2 appears appended to her federal tax returns. *See id.*

21.    Zoo 2 kept no records of that it owed obligations to Schreibvogel either under the 2013 and 2015 Leases or under alleged loans; there is no log tracking payments. *See* Ex.5 at 74:15-75:4; 77:18-78:17; 94:8-15. Maldonado simply assumed Zoo 2 owed Schreibvogel money and directed that checks be provided. *See* id. at 74: 21-75: 1-4.

## C.    Schreibvogel actively assisted Zoo 2 and Maldonado in placing assets beyond the reach of creditors to render the Judgments uncollectible.

### The Zoo Land

22.    As part of his original 2013 plan to avoid the Judgments, Maldonado filed companion Chapter 7 bankruptcy cases for himself and Zoo 1 in March 2013. *See* Ex. 2 at 13 SUF ¶¶ 19, 22. The court dismissed Zoo 1's bankruptcy case as a fraudulent filing. *Id.* at SUF ¶¶ 20, 21. Though Maldonado's continued, the court entered a non-dischargeability judgment against him *Id.* at SUF ¶ 25. As noted, Schreibvogel confessed a $63,300 judgment in an adversary proceeding in Maldonado's bankruptcy. *See* SUF ¶ 18, *supra*.

23.    Schreibvogel used the $30,000 in Zoo 2 donor funds, *see* Fact 14, *supra*, to pay part of the $63,300 judgment:

    Q: And why would it be deposited in your account, your personal account,
       Mrs. Schreibvogel?

A: Because I wrote a check with it.

. . .

A: Okay. And what for?

A: To buy some land.

. . .

A: I bought it out of a bankruptcy.

Q: --and you paid the bankruptcy trustee a total of about $63,000; correct?

A: Correct.

Q: And this $30,000 donation to the zoo was used to do that; correct?

A: Yeah.

*See* Ex. 8 at 111:22-112:1; 112:2-113:2.

24.     Having satisfied the bankruptcy judgment with at least $30,000 of Zoo 2's money, Schreibvogel retained ownership of the Zoo Land until, on or about September 9, 2015, when, for no consideration, she executed a quit claim deed transferring the Zoo Land to herself and Jeff Lowe ("Lowe") as joint tenants. *See* Ex. 21 (September 2015 Quit Claim Deed); *see* Ex.8 at 132:18-21.

25.     Schreibvogel admitted although she had only recently met Lowe at the time she transferred the Zoo Land, she transferred it because "[m]y son knows him very well, that's why." Asked whether she had been advised to transfer the land to Lowe, or whether she had done it of her own volition, Schreibvogel replied that it had been "a family conversation" between her "and Joe." *See* Ex.8 at 129:14-24; 131:19-24; 132:25-133:5. Maldonado concedes he directed Schreibvogel to transfer the Zoo Land to Lowe. *See* Ex.5 at 108:108:10-22.

8

26.     Schreibvogel likewise concedes she transferred the Zoo Land to Lowe to prevent BCR from executing on it: "I couldn't put Joe's name on it because of your client." Asked, "Because of the lawsuit?", she answered, "That's right. Because I knew she would grab it up in a heartbeat." And "[a]s long as the lawsuit has Joe tied up to where Carol[3] is going to grab everything he has, I am getting old, I am getting sick, I don't want it to go to anybody else, and he is a good friend of Joe's." *See* Ex.8 at 130:2 – 131:1.

27.     Lowe moved to Wynnewood in the fall of 2015, began building a cabin on the Zoo land, and moved in permanently by January 2016. *See* Ex. 23 (Indiv. Dep. Tr. J. Lowe) at 127:3-16; 224:22-225:5.

**The Four Vehicles**

28.     In February 2016, Zoo 2 was using and making payments on four vehicles subject to financing contracts: 1) a 2014 RAM 3500 Laramie Longhorn Edition, one-ton truck 2) a 2014 maroon Dodge dually; 3) a 2012 blue Ford F-150; and 4) a 2008 GMC (collectively the "4 Vehicles"). *See* Ex.5 at 137:3-25; 138:24-16. The 4 Vehicles were purchased when Zoo 2 was running the Wynnewood animal park, and were purchased for Zoo 2's use. *See id.* at 141:5-7. Zoo 2 made payments on, paid for insurance and maintained the 4 Vehicles. *See id.* at 138:8-139:16. Zoo 2 used each of the 4 Vehicles. The 4 Vehicles were essential to Zoo 2's operations. *See* Ex. 23 (Corp. Rep. Dep. Tr. J.

---

[3] Schreibvogel and Maldonado use the word "Carol" to refer to BCR. *See* Ex. 28 (Affidavit of Chealsi Putman) at 7 ¶ 14.

Lowe) at 226:5- 227:11.  However, they were "used by," not leased to, Zoo 2. *See* Ex.  9 (Schreibvogel's 2nd Am. Resp. to Pltf's Interrogs.) at Ans. 16.

29.     **2012 Blue Ford F-150 Crew Cab Half-ton Pickup.** Schreibvogel applied for financing to purchase this vehicle through Seth Wadley Ford Lincoln in Pauls Valley on February 28, 2015. *See* Ex.5 at 140:12-141:4.

30.     When she applied for financing for this vehicle on February 28, 2015, she represented in the application that she was employed by G.W. Animal Park and earning $9,500 per month. *See id.* at 141:8-19; Ex.25 (Bus. Rec. Aff. Ethan Murray, & First Un. Bk. Docs.) at FUB&T-SS_000002,03, 00009,014. That representation was not true; Zoo 2 never employed Schreibvogel and she did not earn $9500/month. *See* Ex.5 at 140:12-141:19. She reported no income from Zoo 2 on her 2013-1016 federal income tax returns. *See* Exs. 17-20.

31.     When the financing contract was approved, Schreibvogel executed a Retail Installment Sales Contract with First United Bank and Trust, Durant Oklahoma in the principal amount of $56,573. *See* Ex. 25 at FUB&T-SS_000002,03.  Monthly payments are $854.80. *Id.*

32.     **2014 RAM 3500 Pickup**. Schreibvogel applied for financing to purchase the 2014 RAM 3500 Pickup through Seth Wadley Ford Lincoln in Pauls Valley on June 5, 2014. See Ex.5 at 140:12-141:4.

33.     In applying for financing, it is inaccurately represented that G.W. Animal Park employed her for $9,500 per month. *See id*. at 141:8-19.

10

34.     Financing for the purchase price of $75,780 was approved by JP Morgan Chase Bank.

35.     **2008 GMC Sierra 2500.** Schreibvogel applied for financing to purchase the 2008 GMS Sierra 2500 on March 19, 2015 through Seth Wadley Auto Group in Pauls Valley on or about March 19, 2015. *See* Ex. 26 (Bus. Recds. Aff., Thomas Mathew, & Seth Wadley Docs.) at WADLEY-000015, 19, 000048, 52.

36.     In applying for this vehicle, the application inaccurately represents Schreibvogel was employed by Gw Animal Park with a monthly salary of $9,500.00. *See* WADLEY-000051-52.

37.     Financing for this vehicle's purchase price of $42,509 was approved by Chrysler Capital. *Id.*

38.     **The 2012 Dodge RAM 3500.** Schreibvogel applied for financing to purchase the 2012 Dodge RAM 3500 in June 2014 through Seth Wadley Ford Lincoln. *See* Ex. 5 at 137:5-25. The vehicle is used and paid for by the zoo. *Id.*

39.     Schreibvogel's IBC and PVNB Accounts received significant periodic cash deposits. See Exs. 6 and 7.   She received cash generated by Garold Wayne Zoo, ultimately deposited into her personal accounts, which Maldonado delivered to her. *See* Ex.28 at 3, ¶ 7. Maldonado sometimes delivered the cash to Schreibvogel's home where she kept it in a safe. She periodically deposited the cash into her IBC Account. *Id.* Schreibvogel had no other significant source of cash income; other than cash from Maldonado, she received periodic payments from rental of farmland she owned in Kansas, Social Security income, and mineral royalty payments. *Id.* Shirley Schreibvogel

11

keeps a small amount of cash in her home. *See* Ex. 9 (Schreibvogel's 2nd Am. Resp. to Pltf's Interrogs.) at Ans. 20.

**Portable Buildings**

40.    On December 29, 2014, Schreibvogel executed two Lease/Purchase Agreements with Affordable Buildings, LLC, through Parks Leasing, LLC, to purchase two portable buildings for use by Zoo 2 on the Zoo Land. *See* Ex.29 (Bus. Recds. Aff., Caleb Driscoll, & docs. from Parks Lsg) at Parks Leasing_000001-000009, 000012-000016. The Application inaccurately stated GW animal Park employed her. *See id.* at Parks Leasing _000012; Ex. 5 at 127:14-129:14. With regard to all portable buildings, the building shells were delivered to Zoo 2, and Zoo 2 paid to connect the plumbing and other utilities, and to otherwise "finish out" the buildings. *See* Ex.5 at 126:25-13.

41.    In January and March 2015, Shirley Schreibvogel executed two more Lease/ Purchase Agreements with Affordable Buildings, LLC, through Bradford Leasing, LLC, to purchase two portable buildings for use by Zoo 2 on the Zoo Land. *See* Ex.30 (Bradford Lsg.) at Bradford Leasing 000001-000005. According to defendant, Zoo 2 did not lease the buildings, but only uses them. Zoo 2. *See* Ex. 9 (Schreibvogel's 2nd Am. Resp. to Pltf's Interrogs.) at Ans. 16. The buildings were used for the Zoo 2 office and nursery. The portable buildings can be moved. *See* Ex.5 at 37:19-38:17.

42.    Zoo 2 made payments by check and cash Maldonado delivered to Schreibvogel on the portable buildings. *See* Ex. 5 at 97:19-100:24; Ex. 29 Parks Leasing_000033-000035, 000049-000051; Ex. 30 Bradford Leasing 000008. The same buildings are being paid for by GWDG. *See* Ex. 5 at 129:15-131:25.

12

**D.**   **The creation of and further fraudulent transfers to Greater Wynnewood Development Group, LLC.**

43.    Zoo 2 was insolvent throughout its existence. *See* Ex.5 at 48:16-49:16;77:1-17; 64:10-20; 119:1-9;  151:1-25.

44.    On February 5, 2016, three days after this Court's entry of the Judgment in BCR's favor against Zoo 2, Zoo 2's Board voted to dissolve. *See* Ex. 37.

45.    Also on February 5, 2016, Maldonado posted a video on Zoo 2's Facebook page, in which he announced that as of that day, a new entity called Greater Wynnewood Exotic Animal Park would be taking over day to day operations of the park while walking through the grounds of Zoo 2. See Ex.38.

46.    Lowe created GWDG on or about February 8, 2016. *See* Ex. 32 Certificate of LLC.

47.    Prior to creating GWDG, Lowe knew BCR was in litigation against Zoo 2 to establish that it was liable for the Judgments. He attended the November 2015 follow-up mediation phone conference between BCR, Zoo 2 and the mediator intended to finalize the settlement agreement in the Successor Liability/Fraudulent Transfer Action. Lowe told the parties, unannounced, the "settlement was off" and he would fund the case through trial and pay Zoo 2's legal bills. He angrily and obscenely addressed BCR's principal and settlement representative, Howard Baskin, in the phone conference, stating "F*** you Howard, and f*** your c*** wife." *See* Ex. 23 at 183:18-19.

13

48.     Lowe and Schreibvogel each hold a membership and/or financial interest in GWDG. Exhibit 24, (GWDG's Responses to Plaintiff's Interrogatories) at Response to Interrog. No. 6.

49.     On or about February 12, 2016, Schreibvogel and Lowe transferred the Zoo Land by quit claim deed to GWDG. *See* Exhibit 39 (Quit Claim Deed); Exhibit 33, (GWDG's Responses to Requests for Admission), at No. 3.

50.     GWDG assumed payments from Zoo 2 on the 4 Vehicles and Portable Buildings, which are still in daily use at the Wynnewood animal park. *See* Ex29 at Parks Leasing _000019-000020, 000037-000038; Ex. 30 at Bradford Leasing 000022-23.

51.     On February 15, 2016, GWDG entered into a Land Lease Contract (the "2016 Lease") with Greater Wynnewood Exotic Animal Park ("Zoo 3"), a newly-created entity, for the Zoo Land and all cages, buildings, and fixtures thereon, "to use as an animal park." *See* Land Lease Contract, Ex. 34.

52.     Lowe is the sole member of Zoo 3. *See* Exhibit 24, (GWDG's Responses to Plaintiff's Interrogatories) at Response to Interrog. No. 24.

53.     By operation of the 2015 Land Lease between Schreibvogel, Maldonado claims that all of Zoo 2's assets, except the $3,000 of odds and ends he culled from Zoo 2's grounds and sold to a junk dealer, were transferred to either Schreibvogel or GWDG when Zoo 2 dissolved. See Ex.5 at 150:12-151:19.

## II.   ARGUMENT AND AUTHORITIES

### A.   BCR is entitled to a constructive trust on the Zoo Land, the 4 Vehicles and Portable Buildings.

To prevent the further unjust enrichment of Schreibvogel and GWDG, and to end the ongoing fraud being perpetrated against BCR, BCR is entitled to a constructive trust on the Zoo Land, 4 Vehicles and Buildings.

"A constructive trust arises by operation of law." *Nichols v. Nichols,* 2009 OK 43, 222 P.3d 1049, 1054 n. 16 (citations omitted). "A constructive trust is one of equity's most powerful fraud-rectifying devices." *Delk v. Markel Am. Ins. Co.*, 2003 OK 88, 81 P.3d 629, 640 n.48. As one court observed:

> The primary reason for imposing a constructive trust is to avoid unjust enrichment. It is imposed against one who by fraud, actual or constructive, by devices or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Okla. Dep't of Sec. ex rel. Faught v. Blair*, 2010 OK 16, 231 P.3d 645, 659, as corrected (Apr. 6, 2010) (quoting *Easterling v. Ferris*, 1982 OK 99, 651 P.2d 677, 680)). *See also Phillips v. Ball*, 1960 OK 145, 358 P.2d 193, 197 ("Where a party obtains legal title to property by fraud, violation of confidence, or in *any other unconscientious manner*, equity will impress a constructive trust on property so obtained for one who in good conscience is entitled to it." (emphasis added)).

To obtain a constructive trust, a party must show "sufficient wrongdoing" by the party "acquiring the property" and be able to trace the wrongfully-held property." *In re*

*Seneca Oil Co.*, 906 F.2d 1445, 1450 (10th Cir. 1990) (citations omitted). "A constructive trust imposes an equitable duty to convey specific property to another." *In re Pardee*, 433 B.R. 377, 387 (Bankr. N.D. Okla. 2010). For instance, in *Seneca Oil*, the Department of Energy ("DOE") sought to recover overcharges for oil sold by Seneca Oil in violation of then existing law. 906 F.2d at 1449. After the court awarded DOE a judgment, Seneca Oil filed for Chapter 11 bankruptcy. *Id.* In the bankruptcy proceedings, DOE asserted that it was entitled to a constructive trust over funds Seneca Oil had obtained from the overcharges. *Id.* The Tenth Circuit held that overcharging for oil and gas in violation of federal law was sufficient to constitute wrongdoing on the part of Seneca Oil. *Id.* Ultimately, the Court concluded that a constructive trust was properly imposed on the funds in favor of DOE. *Id.* at 1456.

In a more recent case, a rural water district ("District") sought the imposition of a constructive trust over water lines and facilities owned by the City of Coweta. *Rural Water Dist. No. 5 v. City of Coweta*, 202 F. Supp. 3d 1268, 1271 (N.D. Okla. 2016). Pursuant to federal law, the District had the exclusive right to provide water service to all customers within its service area. *Id.* Nevertheless, Coweta negotiated with property developers stating it would not provide sewer service unless the developers accepted Coweta water as well. *Id.* at 1272. The court concluded Coweta had engaged in wrongdoing because city officials knew the District claimed an exclusive right to serve the customers in the subject developments, yet pressured the developers to accept its water service. *Id.* at 1279. Moreover, "Coweta did not pay for any of the on-site water facilities that were deeded to it," and, had Coweta not wrongfully obtained possession of

16

those water facilities, they "would most likely have been initially deeded to [the District] instead of Coweta." *Id.* Due to Coweta's ongoing "questionable behavior," the court concluded imposition of a constructive trust on the on-site water facilities and infrastructure was required by equity.[4]

Applying well-established law here, the undisputed facts clearly and unequivocally support imposition of a constructive trust on the Zoo Land, the 4 Vehicles and Portable Buildings in BCR's favor.

First, as to the Zoo Land:

(1)     Schreibvogel confessed she was a party to the 2011 fraudulent Zoo Land transfer designed to prevent BCR from executing on the unencumbered land to apply to its Judgments, *see* SUF 17.

(2)     To pay the resulting $63,300 *fraudulent transfer judgment*, she secretly used Zoo 2 funds transferred to her in violation of an injunction that barred transfer of assets outside the ordinary course of business. *See* SUF ---. The cleverest rhetorician could not transform the secret transfer of Zoo 2's largest donor check to Schreibvogel to pay a personal *fraud judgment* to an act within the "ordinary course of business." *See, e.g., In re Maloney-Crawford*, 144 B.R. 531 (Bankr. N.D. Okla. 1992) (payments to settle

---

[4] *See also Phillips*, 1960 OK 145, 358 P.2d at 197-98 (finding constructive trust and equitable lien over estate assets distributed to heirs who had knowledge of an additional heir but did not identify their heir during probate of the estate); *Goldsby v. Juricek*, 1965 OK 101, 403 P.2d 454, 458 (imposing constructive trust in favor of incompetent defendant on mineral interests where bidders for the subject property illegally conspired to depress the sales price of the mineral interests); *Peyton*, 1966 OK 4, 417 P.2d at 320-22 (imposing constructive trust over funds held in a joint checking account where co-depositor attempted to keep the funds from deceased co-depositor's heirs).

a dispute are not in the ordinary course of business). Schreibvogel deposed the $30,000 donor check on February 13, 2015, *less than eight weeks* after the Court entered the Injunction preventing such transfers. *Id.* She failed to report the $30,000 as income on her federal tax returns. *See* Exs. 16-20.

　　3)　　After using the $30,000 in Zoo 2 funds to pay her fraudulent transfer judgment, Shirley transferred the Zoo Land to Lowe admittedly to prevent BCR from executing upon it. While she reported rental income from Kansas property on her tax returns, she failed to report Zoo Land lease payments. Apparently, the failure to report the rental income did not result of ignorance or oversight. Instead, the unencumbered Zoo Land is an easily identifiable, unencumbered asset of great value to creditors.[5] Zoo 2 and Shirley have engaged in precisely the kind of bad faith behavior with regard to the Zoo Land that justifies imposition of a constructive trust over it.

　　As in *Rural Water District No. 5* where Coweta obtained water facilities with full knowledge that another had a rightful claim to them, so did Schreibvogel obtain the Zoo Land with funds that she knew were subject to an Injunction for BCR's benefit. Lowe likewise acted with full knowledge and in violation of the Injunction and BCR's Judgments in first obtaining an interest in the Zoo Land and then transferring it. The facts demonstrate that, first, Schreibvogel, and then GWDG, obtained title to the Zoo Land by

---

[5] When Zoo 2 dissolved days after entry of the February 2016 Judgment determining that it was liable to BCR, it claimed the sole assets available to creditors was a pile of discards sold to a junk dealer for $3,000. Even Jeff Lowe, who was more than willing to step into the shoes of Zoo 2 and take over the park operations, thought that the Zoo 2 "assets" available for creditors were useless. He did not even make an offer to Zoo 2 for them. In February 2015, Zoo 2 gave Shirley Schreibvogel a donor check worth *ten times* the value of the discards Zoo 2 offered to creditors in February 2016.

"fraud...commission of wrong...unconscionable conduct, artifice, concealment" or, at a bare minimum, "questionable means." *Blair,* 231 P.3d at 659. Every one of these pejorative terms fits what happened here.

The same rationale justifies imposition of a constructive trust over the 4 Vehicles and Portable Buildings. The undisputed facts establish that Schreibvogel has nothing but bare legal title of them. Zoo 2 paid for, insured, maintained and used them. Zoo 2 paid to improve the Portable Buildings.

Zoo 2 and Schreibvogel have demonstrated an astonishing willingness to do whatever it takes – including ignoring this Court's orders (the Injunction), misusing non-profit donor funds (the $30,000 and other donor checks), making false credit applications (the 4 Vehicles and Buildings), and failing to report income (the $30,000 and other checks negotiated to Shirley Schreibvogel) – to prevent BCR from satisfying its Judgments. Since BCR obtained the Judgments, Maldonado and the Wynnewood animal park have conjured myriad schemes and artifices to hide or obscure animal park assets, turning recovery of the simplest asset into an arduous and expensive endeavor.[6] Schreibvogel has been knowingly complicit in these schemes. Their conduct perfectly fits the standard for imposition of a constructive trust. Application of the constructive trust doctrine is required as a matter of law under the undisputed facts.

---

[6] For example, BCR was forced to file a contempt motion after Maldonado refused to obey a court order requiring him to turnover a Great Dane trailer. Obtaining the trailer, which Maldonado claimed was 'junk,' required two evidentiary hearings even after the Court ordered turnover. *See* Case No. 13-fj:1. At the second hearing, Judge Friot, finding Maldonado in contempt, also determined he intentionally understated the income he earns through the animal park in order to avoid the Judgments. *See* Excerpt of Evidentiary Hearing before the Honorable Judge Friot.

B.   **Plaintiff is entitled to an equitable lien on the Zoo Land, the 4 Vehicles and the Portable Buildings.**

Though a distinct remedy from a constructive trust, the equitable lien doctrine is similarly founded on principles of equity and unjust enrichment:

> An equitable lien is a creature of equity, is based on the equitable doctrine of unjust enrichment, and is the right to have a fund or specific property applied to the payment of a particular debt. Such a lien may be declared by a court of equity out of general considerations of right and justice as applied to the relationship of the parties.

*Caldwell v. Armstrong*, 342 F.2d 485, 490 (10th Cir. 1965); *Phillips*, 358 P.2d at 198 ("The basis of equitable liens is variously placed on the doctrines of estoppel or unjust enrichment, or on the principle that a person having obtained an estate of another ought not in conscience to keep it as between them; and frequently it is based on the equitable maxim that equity will deem as done that which ought to be done, or that he who seeks the aid of equity must himself do equity."). There are two kinds of equitable liens, those that arise from contract and those that a court in equity may impose. *In re Seneca Oil Co.*, 76 B.R. 810, 812-13 (W.D. Okla. 1985).

In *Phillips*, the court imposed an equitable lien on the assets of a decedent's estate where some of the heirs knew there was an additional living heir, but failed to identify that individual in the probate proceedings, thus receiving a greater share of the estate. The unaccounted-for heir later sued seeking her respective portion of the estate. The Court, finding unjust enrichment to the other heirs, imposed both a constructive trust and an equitable lien on the estate assets covering the daughter's proportionate share. 358 P.2d at 197-98.

20

Similarly, in *Commodity Futures Trading Comm'n v. Hudgins*, an individual convicted of running a Ponzi scheme gave a female companion several hundred thousand dollars to pay off the mortgage on her condominium. 620 F. Supp. 2d 790, 792 (E.D. Tex. 2009). The receiver over the Ponzi scheme assets sought imposition of an equitable lien to force turnover of the condominium. The girlfriend responded she was an innocent recipient of the funds having no knowledge of the Ponzi scheme from which they originated. The Court rejected the argument holding that failure to impose an equitable lien would "allow [girlfriend] to become unjustly enriched by the Ponzi scheme at the expensive of [the] victims." *Id.* at 794. Accordingly, the court imposed an equitable lien and also ordered the condominium's sale. *Id.* at 795.

These authorities require imposition of an equitable lien as to the Zoo Land. Schreibvogel and Maldonado's efforts to keep these assets from BCR are unrelenting. Having failed to succeed in the 2011 attempt to fraudulently transfer the Zoo Land out of BCR's reach, Zoo 2 transferred $30,000 to Schreibvogel off of Zoo 2's books to pay the fraud judgment against her. As in *Commodity Futures,* the transfer of $30,000 was part of the fraudulent scheme being perpetrated by Zoo 2 whose very existence was a sham to prevent collection of the Judgments. Schreibvogel's subsequent transfer of the Zoo Land to Lowe, then GWDG, is a continuation of the scam. BCR is entitled to imposition of an equitable lien so the property may be sold to satisfy the Judgments, and so that BCR may use its lien to prevent further alienation.

An equitable lien is likewise proper in the 4 Vehicles and the Portable Buildings. The undisputed facts demonstrate that Schreibvogel, at best, holds no more than bare

legal title in that property. One with bare legal title does not have an economic interest in the property; even a bankruptcy trustee cannot access the equitable interest. *See In re Dwyer*, 250 B.R. 472, 474 (Bankr. D. RI. 2000) (mother who paid all mortgage obligations, and utility, insurance and repair bills, held an equitable interest such that her son, whose name was on the title with her, held only bare legal title)

For these reasons, this Court should impose an equitable trust on the Zoo Land in favor of plaintiff.

**C.      BCR is entitled to summary judgment on its fraudulent transfer claims against Shirley Schreibvogel and GWDG.**

The purpose of Oklahoma's Uniform Fraudulent Transfer Act ("OUFTA") is to permit a creditor "to invalidate a transfer of assets made by a debtor if the transfer has the effect of placing the assets out of the reach of present and future creditors." *Farm Credit Bank of Wichita v. Woodring*, 1993 OK 52, 851 P.2d 532, 538; *see also* 24 O.S. § 119(A)(1). The OUFTA provides several different ways for a creditor to prove a fraudulent transfer, two of which apply here: actual fraud (24 O.S. § 116(A)(1)), and constructive fraud from the fraudulent transfer as to an existing creditor while insolvent and without receiving reasonably equivalent value (24 O.S. § 117(A)).

**1.      GW Zoo transferred $30,000 in donor funds to Schreibvogel with the intent to hinder, delay, or defraud BCR, and, therefore, constitutes an fraudulent transfer with actual fraud pursuant to 24 O.S. § 116(A)(1).**

The OUFTA defines a fraudulent transfer based on actual fraud as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud

22

any creditor of the debtor. . . .

24 O.S. § 116(A)(1). Thus, in order to avoid a debtor's transfer, a creditor must show (a) that the debtor transferred assets; and (b) that such transfer was done with the intent to hinder, delay, or defraud any creditor.

### a.    There was a transfer of the $30,000 in donor funds.

It is uncontroverted that Zoo 2 transferred $30,000 in funds donated to Zoo 2 to Schreibvogel. The OUFTA defines "transfer" as: "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 24 O.S. § 113(12). Zoo 2 parted with the $30,000 cash that Schreibvogel converted to the Zoo Land. Thus, the statutory definition of "transfer" is met. *Id.*

### b.    Zoo 2 transferred the $30,000 to Schreibvogel with the actual intent to hinder, delay, or defraud BCR.

The Court must void Zoo 2's transfer of the $30,000 to Schreibvogel under OUFTA if the Court determines the purpose of the transfer was to evade creditors. Here, there is both direct and indirect evidence that Zoo 2 transferred assets to Schreibvogel to place them beyond BCR's reach.

Direct proof of Zoo 2's fraudulent intent comes from Schreibvogel's own actions and statements. With regard to the original transfer of the Zoo Land from Maldonado to Schreibvogel in 2011, she admitted that the transfer was done to protect the Zoo Land from creditors including BCR. *See* Ex.9 at 62:2-63:8. Next, once the Chapter 7

23

Bankruptcy Trustee's adversary proceeding forced the scheme to the light, Zoo 2 violated the Injunction in order to surreptitiously provide Shirley with the funds to pay the fraud judgment against here with the overarching goal of protecting the Zoo Land from creditor claims.

OUFTA also identifies eleven, non-exclusive, "badges of fraud" that may indirectly prove actual fraudulent intent. *See* 24 O.S. § 116(B)(1-11). The presence of even one of these badges of fraud may "stamp the transaction as fraudulent." *Land O'Lakes Inc. v. Schaefer*, 3 Fed. Appx. 769, 772 (10th Cir. 2001) ("A single [badge of fraud] may stamp the transaction as fraudulent, and, when several are found in combination, strong and clear evidence on the part of the upholder of the transaction will be required to repel the conclusion of fraud."). Here, in addition to the direct evidence of the fraudulent conduct, several of the suggested "badges of fraud" exist here including: (1) whether the transfer was to an insider; (2) whether the transfer was of substantially all the debtor's assets; (3) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; and (4) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. *See* 24 O.S. § 116(B). The following evidence supports these factors:

1. Zoo 2 owes its entire corporate existence to its function as a sham entity created as part of a scheme to keep the animal park revenue from BCR. And, as soon as that usefulness was gone – because BCR painstakingly collected evidence to prove it was Zoo 1's successor and had received a fraudulent transfer of all Zoo 1's assets – it was dissolved.

2. Schreibvogel is an insider of Zoo 2

3.   Schreibvogel lied on loan applications when purchasing the 4 Vehicles for Zoo 2, falsely representing she was Zoo 2's co-owner and earned $9,500 monthly from Zoo 2; in fact, she was entitled to no compensation from Zoo 2.

4.   Zoo 2 was insolvent throughout its existence and at the time of the transfers, which Maldonado readily admits. 24 O.S. § 114(A). ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.").

Based either on these "badges of fraud" or on Schreibvogel's actions and statements, the Court presumes that Zoo 2 transferred assets to Schreibvogel with actual intent to hinder, delay, or defraud Plaintiff. Thus, the burden shifts to the defendants to show good faith. *Payne v. Gilmore*, 1963 OK 26, 382 P.2d 140, 144 (defendants must "produce strong and clear evidence…to repel the conclusion of fraud" created by the existence of badges of fraud) (internal citation and quotation marks omitted).

**2.    Zoo 2 transferred assets to Schreibvogel without receiving reasonably equivalent value in exchange, and at the time of the transfer, Zoo 2 was insolvent. This constitutes a fraudulent transfer with constructive fraud as to Plaintiff, pursuant 24 O.S. § 116(A)(2)**

The undisputed facts also compel the conclusion that Schreibvogel is liable under the constructive fraudulent transfer provisions found in 24 O.S. § 116(A)(2) , which provides in relevant part:

A transfer made...by a debtor is fraudulent... if the debtor made the transfer...without receiving a reasonably equivalent value in exchange for the transfer...and the debtor…intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due

The evidence clearly shows constructively fraudulent transfers occurred. First, the record is silent that Zoo 2 received any reasonably equivalent value when it transferred

Zoo 2 checks or other assets to Schreibvogel. With regard to the $30,000 used to pay Schreibvogel's fraudulent transfer judgment, Zoo 2 did not obtain an interest in the Zoo Land. In fact, Schreibvogel transferred it to Lowe, and they together transferred it to GWDG. Zoo 2 received no value for the transfer. There is no evidence that Zoo 2 provided the $30,000 or other checks to Schreibvogel as part of an exchange. Zoo 2 did not owe Schreibvogel income as an employee. Zoo 2 did not borrow money from Schreibvogel – it has no record of loans from her, does not know how much it allegedly owes her, and lacks the most rudimentary formal loan documentation. Meanwhile, Schreibvogel testified she did not loan Zoo 2 any money, and has failed to report the Zoo 2 checks she received and deposited to the IRS as either income or land lease payments. There is no evidence of a quid pro quo, and no reasonably equivalent value may be found. Second, as Maldonado readily admits, Zoo 2 was insolvent during its entire existence.

Because the facts are uncontroverted that Zoo 2 fraudulently transferred assets to Schreibvogel, BCR is entitled to judgment in its favor.

## III.    PRAYER FOR RELIEF

Wherefore, for the reasons stated herein, Plaintiff Big Cat Rescue Corp. respectfully requests that the Court grant the following relief:

(1)    Grant partial summary judgment to Plaintiff and against Defendants Shirley Schreibvogel and Greater Wynnewood Development Group, LLC and impose a constructive trust in favor of Plaintiff 1) on the Zoo Land, vacating the deeds to Shirley Schreibvogel and GWDG, and granting BCR an undivided interest in the Zoo Land, or

26

forcing a sale from which the proceeds may be equitable divided, and 2) on the 4 Vehicles (or their proceeds), and the Portable Buildings, such that BCR may obtain the equity in that property, and liquidate it to apply the proceeds to its Judgments, or prevent further alienation;

(2)     Grant partial summary judgment to Plaintiff and against Defendants Shirley Schreibvogel and Greater Wynnewood Development Group, LLC on Plaintiff's equitable lien claim, and determine Plaintiff has an equitable lien in the Zoo Land, the 4 Vehicles (or their proceeds), and the Portable Buildings, so they may be liquidate or Plaintiff may prevent their further alienation.

(3) Grant partial summary judgment to Plaintiff and against Defendants Shirley Schreibvogel and Greater Wynnewood Development Group, LLC, on Plaintiff's fraudulent transfer – actual fraud claim, with damages in the gross amount of the sums transferred to Shirley Schreibvogel, plus prejudgment and post judgment interest;

(4)     Grant partial summary judgment to Plaintiff and against Defendants Shirley Schreibvogel and Greater Wynnewood Development Group, LLC on Plaintiff's fraudulent transfer – constructive fraud claim, with damages with damages in the gross amount of the sums transferred to Shirley Schreibvogel, plus prejudgment and post judgment interest;

(5)     Award to Plaintiff and against Defendants Shirley Schreibvogel and Greater Wynnewood Development Group, LLC of Plaintiff's reasonable attorneys' fees and costs;

27

(6)    Award to Plaintiff all other relief to which it may be entitled, including any equitable or provisional relief allowed under the OUFTA.

Respectfully submitted,

*/s/ Heather L. Hintz*
Heather L. Hintz, OBA No. 14253
Melvin R. McVay, Jr., OBA No. 6096
Juston R. Givens, OBA No. 19102
PHILLIPS MURRAH P.C.
Corporate Tower, Thirteenth Floor
101 N. Robinson
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-4100
Facsimile: (405) 235-4133
hlhintz@phillipsmurrah.com
mrmcvay@phillipsmurrah.com
jrgivens@phillipsmurrah.com

**ATTORNEYS FOR PLAINTIFF,
BIG CAT RESCUE CORP., a Florida not-
for-profit corporation**

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of June, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Justin D. Meek – jmeek@ntmdlaw.com
Melanie K. Christians – mchristians@ntmdlaw.com
Andre V. Farinha – afarinha@ntmdlaw.com
*Attorneys for Defendants*

*/s/ Heather L. Hintz*
Heather L. Hintz

01216298.DOCX

28