# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

Big Cat Rescue Corp., a    )
Florida not-for-profit     )
corporation,               )
                           )
              Plaintiff,   )
                           )
v.                         )Case No. CIV-2016-0155-SLP
                           )
Shirley M. Schreibvogel,   )
an individual, and         )
Greater Wynnewood          )
Development Group, LLC,     )
                           )
            Defendants.)

DEPOSITION OF JEFFREY LEE LOWE

TAKEN ON BEHALF OF THE PLAINTIFF

IN EDMOND, OKLAHOMA

ON MAY 1, 2018

REPORTED BY:  KERRI L. WOOD, CSR

Jeffrey Lowe                                           May 1, 2018

Page 2

1                    A P P E A R A N C E S

2

3

4      For the Plaintiff:

5              JUSTON R. GIVENS
               HEATHER L. HINTZ
6              Attorneys at Law
               Phillips Murrah
7              Corporate Tower
               101 North Robinson Avenue
8              13th Floor
               Oklahoma City, Oklahoma   73102
9              (405)235-4100
               jrgivens@phillipsmurrah.com
10             hlhintz@phillipsmurrah.com

11

12     For the Defendants and the Witness:

13             MELANIE K. CHRISTIANS
               Attorney at Law
14             Nelson, Terry, Morton, DeWitt & Paruolo
               3540 South Boulevard
15             Suite 300
               Edmond, Oklahoma   73013
16             (405)705-3600
               mchristians@ntmdlaw.com

17

18

19

20

21

22

23

24

25

Jeffrey Lowe                                          May 1, 2018

Page 3

1                    I N D E X

2

3

4                                              Page

5    Exhibits . . . . . . . . . . . . . . . . .    4

6    Stipulations . . . . . . . . . . . . . . .    5

7    Direct Examination by Mr. Givens . . . . . .    6

8    Jurat Page . . . . . . . . . . . . . . . . . 300

9    Correction Sheet . . . . . . . . . . . . . . 301

10   Reporter's Certificate . . . . . . . . . . . 302

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jeffrey Lowe                                    May 1, 2018

                                                      Page 4
 1                    E X H I B I T S

 2

 3

 4                                                    Page

 5    Exhibit Number 1 (Notice to Take Deposition
         of Jeff Lowe) . . . . . . . . . . . . . . .   6
 6
      Exhibit Number 2 (Joint Tenancy Quit Claim
 7       Deed) . . . . . . . . . . . . . . . . . . . 169

 8    Exhibit Number 3 (Affidavit of Jeff Lowe
         dated 3/21/16) . . . . . . . . . . . . . . 213
 9
      Exhibit Number 4 (Affidavit of Jeff Lowe
10       dated 4/18/16) . . . . . . . . . . . . . . 218

11    Exhibit Number 5 (Affidavit of Jeff Lowe
         dated 1/9/17) . . . . . . . . . . . . . . . 225
12
      Exhibit Number 6 (Affidavit of Jeff Lowe
13       dated 9/28/17) . . . . . . . . . . . . . . 228

14    Exhibit Number 7 (The G.W. Zoo, All
         Transactions for Shirley Schreibvogel,
15       January through December 2015) . . . . . . 236

16    Exhibit Number 8 (The Beaufort Gazette
         article) . . . . . . . . . . . . . . . . . 272
17
      Exhibit Number 9 (Facebook post) . . . . . . 280
18
      Exhibit Number 10 (Indictment) . . . . . . . 282
19
      Exhibit Number 11 (Plea) . . . . . . . . . . 283
20
      Exhibit Number 12 (Plea Agreement dated
21       3/19/08) . . . . . . . . . . . . . . . . . 284

22    Exhibit Number 13 (Plea Agreement dated
         4/8/08) . . . . . . . . . . . . . . . . . 286
23

24

25

Jeffrey Lowe                                           May 1, 2018

Page 49

1      A     Not really partners, but I wanted to keep

2    him in the area because I needed his assistance, you

3    know --

4      Q     Mr. Lowe --

5      A     -- with --

6      Q     Go ahead.  I'm sorry.

7      A     -- with his animals.  I mean, he was

8    familiar with his animals; and, you know, I'd -- I'd

9    rather him been there than leave.  And it was a --

10   it wasn't a significant investment.  It was 40- or

11   $50,000.  So, it was worth it to me to keep him in

12   the area and opposed to retire and buy a boat

13   someplace.

14     Q     As a part of Serenity Springs' deal --

15     A     Uh-huh.

16     Q     -- we'll call it -- your potential purchase

17   and his potential sale of that facility to you --

18   was that sale involving the animals or just the land

19   and the fixtures?

20     A     It was -- it was the business of

21   Serenity Springs.  I was buying Serenity Springs'

22   business which included, you know, all the buildings

23   and the fixtures and the gates and the cages --

24     Q     All the assets.

25     A     -- and the animals.

Jeffrey Lowe                                    May 1, 2018

Page 50

1     Q    Were you going to continue to use the name
2  Serenity Springs?
3     A    No.
4     Q    Did you have a name picked out that you were
5  going to change it to?
6     A    Not at the time.
7     Q    As a part of the due diligence, you said you
8  looked at his financials, his books, and records?
9     A    Uh-huh.
10    Q    How were those presented to you?  Were those
11  presented --
12    A    On a computer.
13    Q    How -- by a compu- -- on a computer?
14    A    Uh-huh.
15    Q    And just e-mailed to you, I guess?
16    A    They e-mailed them to me; and then when I
17  went to Colorado Springs, I kind of sat down at the
18  computer one day and reviewed all their books.
19    Q    Were -- as a part of the Serenity Springs'
20  deal, was Mr. Sculac going to maintain ownership
21  over animals?
22    A    No.
23    Q    Were you paying -- at that time were the
24  animals just going to remain there, and was there a
25  value associated with the animals remaining there?

Jeffrey Lowe                                          May 1, 2018

Page 51

1     A    The animals had no value other than, you

2     know, that's where they lived; and, I mean,

3     they're -- they're really not an asset.  They're a

4     liability because you have to feed, you know,

5     400-pound cats every day.

6     Q    Sure.

7          And I guess, really, my direct question is:

8     As a part of that deal, were you paying any monetary

9     consideration for the animals?

10              MS. CHRISTIANS:  Object to the form.

11    A    I was buying the business which included the

12    animals.

13    Q    (By Mr. Givens) Okay.  Okay.

14    A    I was buying the land.

15    Q    The cages, tools, all those kinds of things,

16    all the assets were going to be included?

17    A    Yes.

18    Q    As a -- as a part of that due diligence, did

19    you review an inventory list that --

20    A    I don't remember seeing an inventory list.

21    Q    Okay.  Were there vehicles that were going

22    to be included in that?

23    A    Yes.

24    Q    Other equipment?

25    A    Yes.

Jeffrey Lowe                                    May 1, 2018

Page 52

1      Q     All of those things were ult- -- ultimately
2    valued as a part of what was going to be the
3    purchase?
4      A     Yes.
5      Q     Was Serenity Springs a nonprofit, or was it
6    a for-profit?
7      A     They were a nonprofit, I believe.
8      Q     Okay.  Do you recall -- strike that.
9            And as part of the deal of doing the
10   Serenity Springs -- trying to put the
11   Serenity Springs' deal together, Mr. Lowe, what --
12   had you negotiated a purchase price with Mr. Sculac?
13     A     Yes.
14     Q     And what was that purchase price?
15     A     $275,000.
16     Q     Lock, stock, and barrel?
17     A     Yes.
18     Q     Was that to include phone numbers?
19     A     I don't know.  I don't remember.
20     Q     E-mail addresses?
21     A     No.  I wanted no association with them.
22     Q     And why is that?
23     A     Just because they had a, you know -- as your
24   client well knows, they had a bad reputation.
25     Q     Serenity Springs did?

Page 63

1    Q    And refresh my memory.  A liger is a lion

2    daddy and a tiger momma?

3    A    Correct.

4    Q    Was that the only cub you picked up?

5    A    Yes.

6    Q    And how do you travel with a baby liger --

7    A    In a --

8    Q    -- Mr. Lowe?

9    A    In a pet carrier.

10   Q    Like a -- just like a large dog carrier --

11   A    Yes.

12   Q    -- or something?

13   A    Yeah.

14   Q    Okay.  On that trip, anybody other than you?

15   A    Yes, my -- my former wife, Kathy, and my two

16   kids --

17   Q    Okay.

18   A    -- were with me.  And recollection tells me

19   we picked it up, on the way, on our return trip.

20   Q    Going back west?

21   A    Correct.

22   Q    From North -- South Carolina to Colorado,

23   correct?

24   A    Correct.

25   Q    All right.  All right.  Now we've got that

Jeffrey Lowe                                      May 1, 2018

Page 64

1    point in time nailed down, Mr. Lowe.  From that

2    point in time, when do you believe your first

3    contact -- via telephone, e-mail, whatever -- was

4    with Mr. Schreibvogel?

5       A    I think -- I think my first contact with Joe

6    was maybe a phone call in June, asking him his

7    advice on just -- I -- I heard he was -- you know,

8    Nick talked him up to be this big expert.

9       Q    Mr. Sculac did?

10      A    Yes.  Yes.

11           So, I wanted to have the expert come look at

12   Nick's place and see what he thought.  So, I

13   called -- I either called or sent Joe a Facebook

14   message or something, asking if he would be

15   willing -- if I would pay for his flight, would he

16   be willing to come and kind of evaluate Nick's park

17   for me.

18      Q    And you believe that contact happened in

19   June of '15?

20      A    I think so.

21      Q    After you picked up the cub?

22      A    Yes, because I saw Joe's facility, you know.

23   It looked impressive, bunch of people there.

24      Q    Uh-huh.

25      A    So, I figured he's -- and I was just getting

Jeffrey Lowe                                    May 1, 2018

Page 65

1    back into it, you know, in -- you know, in a big

2    way.  So, I thought he was -- he was the only one

3    that I knew, besides Sculac, who could really give

4    me a solid opinion on a park.

5        Q    Mr. Lowe, is it fair for me to say that at

6    that point in time -- June, 2015, point in time --

7    you had an aim toward getting back into cat

8    ownership, but also exhibiting and owning a zoo-type

9    facility for big cats?

10       A    Sure, that's fair to say.

11       Q    And that's why you were, in fact, pursuing

12   the Serenity Springs' project, correct?

13       A    Correct.

14       Q    I forgot to ask you:  With the -- with

15   respect to the cub being taken to Serenity Springs,

16   was there any forms of transfer or anything that had

17   to be executed and signed?

18       A    There were --

19            MS. CHRISTIANS:  Object to the form.

20       Q    (By Mr. Givens) You can still answer.

21            MS. CHRISTIANS:  You can answer.

22       A    I would have picked up a health certificate,

23   and Joe and Nick -- I was -- I was led to believe

24   Joe and Nick had done the transfer paperwork via

25   e-mail.  All I -- all I carried was the health

Jeffrey Lowe                                        May 1, 2018

1      A      Uh-huh.

2            I paid for all the motorcycles.  Nick fixed

3      them up and sold them which was supposed to -- at

4      that point, he was supposed to -- to divvy up, you

5      know, our split, our -- on our profits.

6      Q      To make some return on your initial

7      investment, correct?

8      A      (Nods head)

9            And he sold them -- we found out he'd sold

10     them weeks earlier and never mentioned it.  So, I

11     was, like, shocked; didn't know exactly what to

12     do -- you know, how to approach it or -- and if I

13     recall -- I was so irritated -- I think -- I think

14     in that end-of- -- the mid- to end-of-August area is

15     when I called Joe and I said, "You want a partner?"

16     Q      At that time, Mr. Lowe, had you made up your

17     mind that "I'm not going forward with the

18     Serenity Springs' matter -- project"?

19     A      I think it was starting to lean that way,

20     you know, with the USDA problems, with -- with

21     Nick's kind of betrayal; and my wife was really

22     upset.  And Joe had indicated while he was there --

23     I mean, Joe was in really poor shape, you know, at

24     that time.  So, I thought that might be my

25     opportunity to ask if he would want a partner in his

Page 89

1    sorry.  How many did you say you had at the

2    Serenity Springs' facility?

3        A    About 20 --

4        Q    Okay.

5        A    -- 23 maybe.

6        Q    Were -- were you keeping them there and just

7    paying for their food and maintenance, or were you

8    also having to pay Mr. Sculac a fee for keeping them

9    there?

10       A    Yes, yes, yes.  I was paying to feed them; I

11   paid to build all new cages; and I was paying him a

12   daily -- a daily care, you know, of, I think it was,

13   $25 a cat.

14       Q    Per day?

15       A    Per day.

16       Q    You built all new cages for your cats to be?

17       A    A couple cages, he had open and available;

18   but the rest, I had -- we had to build.  I bought 7-

19   or $8,000 worth of paneling and pipes and poles.

20       Q    And are those cages you built in June when

21   you moved your cats out there -- or prior to moving

22   them out there?

23       A    Yeah.  Yes.

24       Q    How did the first discussion with

25   Mr. Schreibvogel go when you broached this topic of,

Jeffrey Lowe                                           May 1, 2018

Page 90

1    "Do you want a partner?"

2        A    He said he did not want a partner; but he

3    said, "I'll sell you a zoo if you want to buy a zoo

4    and as long as I could continue to live on the

5    property and work with my animals."

6        Q    Up until that point in time that that

7    discussion occurred, Mr. Lowe, had Mr. Schreibvogel

8    brought up or discussed with you the lawsuits he was

9    involved in with Big Cat Rescue?

10       A    No.

11       Q    So, as we get to late August of 2015, you

12   are unaware of lawsuits between Joe Schreibvogel and

13   his entities and Big Cat Rescue?

14       A    Not completely un- --

15            MS. CHRISTIANS:  Object to the form.

16            Go ahead.

17       A    Not completely unaware because Nick had

18   said -- Nick told me his version of things, which I

19   don't even remember; but he said Joe -- Joe had been

20   sued by somebody and had a big judgment against him.

21       Q    (By Mr. Givens) When did -- when did Nick

22   tell you that?

23       A    I'm not positive.  I mean, it probably would

24   have been in -- you know, while we were building

25   cages, possibly, in June.

Jeffrey Lowe                                    May 1, 2018

Page 93

1    Q    What was the next step you took to move

2    forward with a possible opportunity with Joe and the

3    zoo in Wynnewood, Oklahoma, after that first

4    conversation?

5    A    I think Kathy and I left the kids back in

6    Colorado, and we flew out to -- we flew into

7    Oklahoma City.

8    Q    And to be clear, just for the record -- I

9    know who you're talking about -- but Kathy Lowe,

10   your ex-wife?

11   A    Correct.

12        And we spent the day, walking around the

13   park -- Joe's park.

14   Q    Do you believe that was in September?

15   A    Yes.

16   Q    When you came to Oklahoma to walk around the

17   park in September, did you stay down there at the

18   park; or did you stay in a hotel?

19   A    We stayed in Pauls Valley, in a hotel.

20   Q    How many days did you spend on that -- what

21   I'll call, the first visit to evaluate the

22   opportunity?

23   A    I think it --

24   Q    Is that fair?

25   A    Yes.

Jeffrey Lowe                                    May 1, 2018

Page 94

1          I think it was --

2     Q     Because that's not your first visit to the

3    park.  It would actually have been your second

4    actual visit, correct?

5     A     Correct.  Correct.

6     Q     The first time, you just stopped briefly to

7    pick up a cub.  This is the first visit where you

8    took, what I'll call, an evaluation tour of the

9    park.  Is that --

10    A     Right.

11    Q     -- fair?

12    A     Right.  The first visit, I only saw the back

13   parking lot.  I didn't go into the park.

14    Q     Okay.

15    A     And then when Kathy and I went in September,

16   we walked the park for two days and observed, you

17   know, how it operated and -- and the traffic, where

18   it was located.

19    Q     Tell me about the first day.  Did you go

20   down there straight from the airport?

21    A     We did -- well, we stopped at Chicago Pizza,

22   had a pizza, went to the -- went to Joe's park.  And

23   Joe was, like, really busy.  So, he kind of blew us

24   off for the first couple hours, gave us an

25   opportunity to walk around.

Jeffrey Lowe                                    May 1, 2018

1              MR. GIVENS:  You bet.

2              MS. CHRISTIANS:  Okay.

3              MR. GIVENS:  You bet.  It's -- well,

4     let me ask you this.  It's --

5              THE COURT REPORTER:  On the record or

6     off?

7              MR. GIVENS:  Oh, yeah, let's go off the

8     record.

9         (Discussion off the record.)

10        (Lunch break taken 11:29 a.m. to 12:41 p.m.)

11        (Discussion off the record.)

12    Q    (By Mr. Givens) Mr. Lowe, we're back from a

13    lunch break and back on the record.  I understand,

14    from a brief off-the-record discussion with your

15    counsel, that there may be a couple things you've

16    thought about over lunch with respect to some dates

17    and timing that the record may not currently reflect

18    to be accurate, from your standpoint.

19             No. 1, you had mentioned earlier the first

20    time you heard the name Joe Schreibvogel was in

21    connection with a 911 Animal Abuse page or something

22    of that nature and you believe you read his name in

23    that.  Is that accurate?

24    A    Yes.

25    Q    And when -- and at what point in time did

Jeffrey Lowe                                    May 1, 2018

Page 108

1    you read that or see that?

2        A     That would have been in the fall of 2014 and

3    not '15, as Melanie says I might have said.

4        Q     I think you actually said it correct once

5    and then you said it in '15 --

6        A     Because I thought --

7        Q     -- the second time.

8        A     -- you said it was correct when you said

9    '14, going into '15.

10       Q     Correct.

11             And, so -- but that does clear up the record

12   for us.

13       A     It was the four- --

14       Q     Okay?

15       A     It was '14.

16       Q     And then with respect to the first time you

17   and Mr. Schreibvogel discussed a possible

18   opportunity for you at the Wynnewood zoo here in

19   Oklahoma, when did that occur?

20       A     And it was because of your conversation

21   about when I drove Joe to the airport.  I remembered

22   that we stopped at an Outback Steakhouse and it was

23   during dinner on the way back -- taking Joe back to

24   the airport that I'd asked him if he would entertain

25   the idea of a partner.

Jeffrey Lowe                                          May 1, 2018

Page 109

1      Q     While he was still in Colorado, on the way,

2   taking him to the airport?

3      A     Yes.

4      Q     So, that would have been in late --

5      A     Late August.

6      Q     -- August of 2015?

7      A     Yes.

8      Q     All right.  And, so, that is the first time

9   that you and Mr. Schreibvogel discussed the

10  possibility of your involvement in the -- with the

11  Wynnewood zoo --

12     A     Yes.

13     Q     -- in Oklahoma?

14     A     Yes.

15     Q     Which, at that point in time, was

16  G.W. Exotic, correct?

17           MS. CHRISTIANS:   Object to the form.

18     A     I don't know.

19     Q     (By Mr. Givens) Was called G.W. Exotic?

20     A     I don't know.

21           MS. CHRISTIANS:   No.

22     Q     (By Mr. Givens) In August of 2015?

23     A     Yeah, I don't know what it -- what it was

24  called at that point.

25     Q     No, no, no.  Garold Wayne Zoo.

Jeffrey Lowe                                          May 1, 2018

1    the state of Oklahoma between Big Cat Rescue and

2    Joe Schreibvogel?

3        A    I had no idea.

4        Q    The litigation that Mr. Sculac connected the

5    dots for you on, is that the litigation in Florida?

6        A    I suppose so.  It was -- it was just that he

7    had -- that there was a million-dollar judgment

8    against Joe -- so, wherever that judgment took

9    place.

10       Q    What was the first point in time, Mr. Lowe,

11   that you became aware of litigation involving Big

12   Cat Rescue and Joe Schreibvogel in the state of

13   Oklahoma?

14       A    I don't know that I ever really understood

15   that there was litigation in Oklahoma.  I thought

16   Joe's problems were all about that lawsuit in

17   Florida.  I didn't know -- I didn't know that he was

18   sued again, you know, in -- in another state.

19       Q    What --

20       A    And I don't think I learned it until just,

21   you know, prior to taking, you know, over the zoo.

22       Q    If you hadn't discussed that with

23   Joe Schreibvogel at that time -- and by "that time,"

24   I mean between June and late August of 2015 --

25       A    Uh-huh.

Jeffrey Lowe                                           May 1, 2018

Page 128

1    after.

2        Q    And was he willing to take in your cats?

3        A    He was.  He again told me that he was in

4    poor health, that he was broke, that the park was

5    under water.

6             And I offered -- I said, well, if -- if I

7    would come to the park and help get the park -- get

8    their head back above water so they had water and

9    electricity and catch up with his bills and if I

10   would come and build cages or have contractors come

11   build cages for my animals, would that solve his

12   problems.

13       Q    And what was his response to that?

14       A    He said it would.  He indicated he was in

15   quite a bit, you know; he was behind on a lot of

16   bills; and it wasn't going to be cheap to keep him

17   afloat.

18       Q    And in that discussion, Mr. Lowe, were you

19   and he discussing bills to operate and run the park

20   at Wynnewood?

21       A    Yes.

22       Q    Did he mention, in that conversation, legal

23   bills for litigation that he was involved in with

24   Big Cat Rescue?

25       A    Not at that time.

Jeffrey Lowe                                    May 1, 2018

Page 134

1    pretty much decided -- after Nick did that to me, I

2    was committed -- I -- the only commitment I had

3    further to Nick was a Halloween party fundraiser

4    that was already planned at -- at the Colorado

5    estate.

6              And, you know, I -- I'm not an evil man.

7    So, I -- I allowed them to have that big fundraiser

8    at my house.  But I -- I knew at that point that

9    working with Nick was going to be impossible.

10   Q     Let's go to the next step.  When did Joe get

11   back to you regarding some numbers?

12   A     I think it was just a couple days, and that

13   would have been on a phone call.

14   Q     He called you?

15   A     I don't know.  You know, I can't remember.

16   Q     But you believe it was a phone call with

17   him?

18   A     Yeah.

19   Q     What were the numbers that Joe got back to

20   you with for -- let's first discuss what I'm going

21   to call, as you characterize, getting the zoo out

22   of -- or above water.  What was that number?

23   A     Well, I know at the time that he had --

24   that's why I mentioned that $5200 water bill.  I

25   think he owed $5200 to the water company; 6- or --

Jeffrey Lowe                                          May 1, 2018

Page 135

1    5- or $6,000 to the electric company.  He was 9- or

2    $12,000 behind in his billboard ads; and they were

3    threatening to take his billboards down.

4           He was $2,000 behind in his Dumpster fees;

5    and they weren't picking up the trash at the park.

6    He was in arrears with the Porta Potty people in --

7    to, like, 2,000 or $3,000.  What else?  It was just

8    a number of vendors, you know, that supplied the

9    zoo -- I think the ice cream vendors and the -- I

10   think all -- in all, I went in; and I caught him up.

11   I didn't pay anything forward, but I just caught him

12   up.

13       Q    Did you do that via check or checks?

14       A    No.  No.  I'm -- whenever possible, I'm

15   always a cash person.

16       Q    Did you actually make the cash payments to

17   the vendors, or did you provide cash to Joe?

18       A    I -- I would have to go back and check

19   because I know I did write some personal checks out

20   of Kathy and my bank account.  And the people who

21   would -- not everyone will accept cash.

22           I never -- I never gave Joe cash to do bills

23   because I -- somebody who's that far back on his

24   bills probably doesn't pay his bills.  So, I wasn't

25   about to hand him cash.

Jeffrey Lowe                                    May 1, 2018

Page 145

1                THE WITNESS:  That's a "no."

2                MS. CHRISTIANS:  It's just for purpose

3       of the record --

4                THE WITNESS:  I know.  I --

5                MS. CHRISTIANS:  -- verbal responses.

6                THE WITNESS:  I'm -- I'm horrible with

7       that.

8       Q     (By Mr. Givens) Mr. Lowe, you then called

9       Mrs. Schreibvogel, Shirley Schreibvogel.

10      A     Uh-huh.

11      Q     Tell me about that conversation.

12      A     Well, I reintroduced myself and reminded her

13      that we had met at the park and kind of explained to

14      her my situation in Colorado wasn't working out as I

15      had planned and I needed a place to house my

16      animals, but part of the -- that -- that I was made

17      aware that the park was financially in trouble and

18      adding my cats without some financial support would

19      be too burdenous on the park.

20               And that's at the point where I offered to

21      help get the park back on level ground if -- in

22      exchange for being added to the deed and in exchange

23      for adding -- if -- if I was -- in consideration of

24      me investing all the money and permanent structures

25      that were to be built on the zoo ground.  I didn't

Jeffrey Lowe                                May 1, 2018

Page 146

1    want another situation like Colorado where my cats

2    were out of my control on someone else's property.

3        Q    Did Shirley Schreibvogel express an

4    understanding to you on the telephone?

5        A    I think she understood.

6        Q    In your conversations with

7    Mrs. Schreibvogel, did you ever feel like she was

8    not mentally capable to discuss and understand and

9    make a decision about those issues?

10       A    Not at that time.

11       Q    Did Shirley Schreibvogel express any concern

12   to you at that time about that arrangement that you

13   and Joe had discussed?

14       A    She -- she didn't indicate any.

15       Q    Did she specifically discuss how you would

16   be added to the zoo land?

17       A    No.

18       Q    Did you specifically propose how you would

19   be added to the zoo land?

20       A    Well, before I even suggested it, I went to

21   the Wynnewood tax website and pulled a copy to make

22   sure that she was actually on the zoo land; and I

23   was kind of surprised, I guess, that -- that's when

24   I learned Francis wasn't, that it was just Shirley.

25           And that's what I used as my basis for

Jeffrey Lowe                                    May 1, 2018

Page 147

1   asking to be added to it -- because I knew it was

2   there, I knew it was clear.  There were no liens, no

3   debts against it.  So, I figured that was a safe way

4   to protect my loan to the park and my improvements

5   to the park, should I move my animals there.

6       Q    Shirley expresses her agreement for that

7   arrangement?

8       A    Uh-huh.

9       Q    What's the next thing you do to effect this

10  arrangement?  Is that the point at which you began

11  writing some checks and providing some --

12      A    No, I don't --

13      Q    -- cash?

14      A    I -- I didn't at that point.  I waited

15  until -- at some point I was either e-mailed or

16  texted a photo of a deed with my name -- my

17  abbreviated name.  I mean, it didn't have my full

18  legal name on it.  But I kind of expressed some

19  concerned.  I called the tax clerk, asked if that

20  mattered that my full legal name wasn't on it and --

21      Q    And when you say your "full legal name," my

22  guess is it --

23      A    Jeffrey Lee Lowe.

24      Q    -- it didn't say Jeffrey D. (sic) Lowe, it

25  said --

Jeffrey Lowe                                    May 1, 2018

Page 148

1    A    It said --

2    Q    -- Jeff Lowe.

3    A    -- Jeff Lowe, yeah.

4         And she explained that that wouldn't be a

5    problem.

6         I said, "Well, so, anybody named Jeff Lowe

7    could come up and make claim?"

8         And she said my interest in the park would

9    be secured.  So --

10   Q    The clerk?

11   A    -- that's -- the clerk at the court.

12        So, that's when I asked Joe to start

13   gathering up the most important bills that needed to

14   be addressed immediately; and I also placed an order

15   for a whole bunch of steel.

16   Q    And at that point in time, Mr. Lowe -- the

17   first ten days of September -- well, let me ask you

18   this:  Would that have been within the first

19   ten days of September?

20   A    Yeah.

21   Q    Okay.  So, at that point in time, all of

22   these things, these arrangements are being done as

23   provisions and agreement of a place for you to

24   secure your cats -- your big cats?

25   A    Correct.

Jeffrey Lowe                                    May 1, 2018

1    Q    Once you received a -- was it a texted

2    photograph of the deed?

3    A    I think it was a texted photograph.

4    Q    And -- and during this time, Mr. Lowe --

5    just say from the 1st of September through the 10th

6    of September of 2015 -- were there communications

7    being made by and among you, Joe Schreibvogel, and

8    Shirley Schreibvogel on e-mail?

9    A    I don't think Shirley's ever sent an e-mail,

10   and Joe and I very rarely e-mailed.  I think we were

11   more texting guys.

12   Q    What about anyone on either Joe Schreibvogel

13   or the park's behalf e-mailing you any documents for

14   review or execution in connection with that

15   arrangement?

16   A    No.

17   Q    At that time were the partnership in the

18   park discussions still being had until -- or were

19   they put on hold while you just got your cats

20   placed?

21   A    They were kind of put on hold because I

22   still wasn't positive that -- for one thing, I

23   wasn't positive how my marriage was going to end up;

24   and I wasn't -- I wasn't thrilled about the idea of

25   moving to such an isolated space.  And I had paid so

Page 150

1    much money up-front for the home in -- in Colorado

2    that I didn't want -- and -- and it was kind of

3    isolated.  I didn't want my kids and my ex in that

4    house alone in the middle of nowhere.  So, it was my

5    intention to stay in Colorado for a long time.

6            I mean, but as I got more and more

7    financially vested in the zoo, I kind of took more

8    interest in what was going on there and wanted to

9    see the operation and how it worked.  But -- again,

10   the point of your question?

11       Q    Yeah, I was just -- my question was -- and

12   you answered my question, Mr. Lowe.  But my question

13   was:  Were the partnership discussions put on

14   hold --

15       A    Yeah.

16       Q    -- while you were working out your

17   arrangements of placing your cats there to keep them

18   safe?

19       A    Yes.

20       Q    And, so, fair for me to say at that time

21   your primary goal was getting your cats placed and

22   put there safely?

23       A    Yes.

24       Q    Then you would look at what the next step

25   might be --

Page 175

1          MS. CHRISTIANS:  Object to the form.

2    He's already answered this.

3          THE WITNESS:  Yeah.

4    A    I told you I thought it was the end --

5    either the end of November, first of December

6    sometime.

7    Q    (By Mr. Givens) Yeah.  Well, that's why I'm

8    asking was it prior to November of 2015.  I want to

9    make sure the record's clear.

10   A    Prior to November?

11   Q    Yes, sir.

12   A    No.

13   Q    You recall being on a conference call with a

14   mediator and parties to the lawsuit where a

15   settlement was being discussed?

16         MS. CHRISTIANS:  Object to the form.

17   A    I wasn't on a conference call.  I walked

18   into the office during a conference call that was

19   being made.

20   Q    (By Mr. Givens) And who was in the office on

21   that call where you were located?

22   A    Who was there?  I think -- I know Joe was

23   there.  I think it was just Joe and Reink were in

24   the office.

25   Q    And you walked into the office?

Jeffrey Lowe                                        May 1, 2018

Page 176

1      A     Uh-huh.

2      Q     Did you know why they were in the office on

3    a conference call?

4      A     I could figure it out.  I could tell.  I

5    heard Howard's voice.

6      Q     Did you know, prior to walking into the

7    office, that that call was going to take place?

8      A     I don't think I was made aware, no.  If I

9    was, I probably wouldn't have walked in.

10     Q     After you walked in, how did you become

11   aware that it was a conference call discussing a

12   settlement agreement?

13              MS. CHRISTIANS:  Object to the form.

14     A     I could tell by the content of what was

15   being said --

16     Q     (By Mr. Givens) What did you hear?

17     A     -- and -- and because I knew that the day

18   prior, Joe was involved in a -- in a -- in a

19   mitigation or some --

20     Q     Mediation?

21     A     -- kind of -- mediation or -- or settlement

22   agreement that whole day; and he came back and was

23   upset and pissed off that whole night.

24     Q     Did you discuss the -- that day's

25   mediation --

Jeffrey Lowe                                              May 1, 2018

1     A    He just --

2     Q    -- with him?

3     A    -- was venting that how unreasonable

4   everyone is and they want to show -- close him down,

5   and he indicated that he made some sort of a -- a

6   very fair-sounding settlement offer and that it was

7   re- -- that it was turned down.

8     Q    Did you -- in his ranting, as you say, did

9   you sit and have a specific discussion with him

10   about details of a settlement agreement?

11     A    No.  He was too -- he was too pissed off.

12   He was just --

13     Q    After that initial ranting that you

14   observed, did you ever sit down with him and discuss

15   with him details of a settlement agreement?

16     A    No.  I -- Lauren and I were at the park.  We

17   went home and went to bed.  And it was not -- that

18   conference call was the following day at some point.

19   So, between -- between us going to bed and that

20   conference call, we didn't -- I don't even think we

21   spoke.  I think the conference call was the first

22   time I saw Joe the following day.

23     Q    And you walked in.  You overheard the

24   conference call.  You --

25     A    (Nods head)

Jeffrey Lowe                                    May 1, 2018

Page 180

1     A     I don't know.  You know, Lauren and I were

2   staying in hotels that whole month; and I lost track

3   of time.  I -- I think it was the next day.  I mean,

4   if you ask me to make my best guess, I would say it

5   was the next day.

6     Q     Just based on your memory?

7     A     Yeah, just based on my old --

8     Q     Okay.

9     A     -- de- -- decrepit memory.

10    Q     In any event, whether it was the next day or

11  days later, you -- you're at the park still.  You

12  walk in.  Joe Schreibvogel and John Reinke are on a

13  conference call with someone else.  You hear voices

14  and determine that the conference call is dealing

15  with the subject matter of settlement.

16    A     (Nods head)

17    Q     Is that correct?

18    A     That's correct.

19    Q     And settlement of the litigation that Joe

20  was involved in with Big Cat Rescue?

21    A     Correct.

22    Q     Did you sit in there and listen for a while?

23    A     I listened for probably ten minutes, and Joe

24  called me -- you know, he did this (Indicating).

25    Q     Motioned to --

Page 181

1     A     He motioned me back (Indicating).

2     Q     You're -- and for the record, you're

3  motioning with your hand --

4     A     Yes.  He --

5     Q     -- and fingers?

6     A     -- was like draw -- "Come hither," you know,

7  with his finger.

8     Q     "Come listen to this?"

9     A     Exactly.

10    Q     And, so, you sit down and listen?

11    A     I stood behind him.  He was sitting in his

12  chair, red as cinnamon.  And I could tell he was

13  really upset, and he had his -- his waste can in

14  front of him where he had been puking.

15          So, I thought, "This is just ridiculous."

16          And I heard Howard speaking and two

17  attorneys going back and forth.

18    Q     Howard who?

19    A     Howard Baskin.

20    Q     Okay.  How do you know it was Howard you

21  heard speaking?

22    A     I've heard him before.  I've heard Howard

23  YouTube videos and --

24    Q     You -- you believe it was Howard, or you --

25  you --

Jeffrey Lowe                                        May 1, 2018

Page 182

1    A    Just as he believed it was me --

2    Q    As you --

3    A    -- on the phone, yeah.

4    Q    Did he announce, "This is Howard?"

5    A    Yes.  Every time -- I think before -- before

6    they all spoke, they kind of introduced or -- or

7    acknowledged who it was speaking --

8    Q    Such that --

9    A    -- because there was -- there were so many

10   people on that call that it was -- it would have

11   been confusing if everybody was just talking over

12   one another.

13   Q    And did you announce your presence on the --

14   as -- as a listener on that conference call?

15   A    Not until I erupted.

16   Q    And what happened next?  What did you do or

17   say when you "erupted," as you say?

18   A    It got to the point where I -- I could tell

19   John Finlay was on the call, and I could tell that

20   Gary Douglas was on the call.  And I could tell that

21   they were trying to -- John Finlay's not the

22   sharpest tool in the shed, and it seemed to me that

23   they were trying to manipulate Finlay into admitting

24   or confessing or accepting something and they were

25   trying to confuse Gary Douglas.

Jeffrey Lowe                                              May 1, 2018

Page 183

1    Q    When you say "they," who is "they"?

2    A    The attorneys.

3    Q    Who --

4    A    It -- it just --

5    Q    What attorneys?

6    A    I would assume you-all, representing Big Cat

7    Rescue, and --

8    Q    You assume, but you don't know that?

9    A    I don't know that to be a fact.

10   Q    Okay.

11   A    But it was opposing counsel.  It wasn't

12   Joe's attorney.  And Joe was just sitting there,

13   shaking his head; and they were basically trying to

14   get Joe -- I -- I remember Joe saying something to

15   the effect of -- of they -- "Gary, they want to shut

16   me down.  They want to take away -- I can't ever own

17   animals," and this and this and this.

18        And that's when I said, "You know what?

19   Fuck this.  Howard, fuck you.  Fuck your cunt wife.

20   I will pay to take this to trial," because I knew

21   that was Joe's concern.  Joe knew he didn't have the

22   money to go to trial.

23        So, it was at that point I offered Joe the

24   money to take him to trial so he could resolve this

25   in a courtroom as opposed to concede in -- in some

Page 184

1    kind of a mediation.  I didn't think he was going to

2    be any o- -- any worse off going to a judge and

3    letting a judge decide this as the deal he was about

4    to accept in mediation.

5        Q    And at the time you "erupted"; made those

6    statements; and then made the offer you just

7    described, to Joe, to fund the litigation -- based

8    on your prior testimony, you didn't know anything

9    about the lawsuit at that point, did you?

10       A    I didn't --

11       Q    So --

12       A    -- I mean, just very little --

13       Q    -- just to be clear, you --

14       A    -- a trademark violation.

15       Q    -- you made that offer and those statements

16   without knowing any of the details of the lawsuit?

17       A    Just that it was a trademark infringement.

18       Q    And there was an existing judgment against

19   Joe?

20       A    Yes.

21       Q    At the time you "erupted," made the

22   statements you made, and made the offer to Joe, did

23   you know there was a judgment against G.W. Exotic

24   park?

25       A    I did not.

Jeffrey Lowe                                    May 1, 2018

Page 197

1   ledger you referenced earlier?

2       A     They would be.

3       Q     During that month of December of 2015, were

4   you trying to decide whether or not you wanted to

5   take over the park?

6       A     This will sound morbid but part of my

7   decision was based on whether I could live here and

8   part of it was based on Joe's health because Joe had

9   kind of made it sound like he was, you know, very,

10  very sick.  And he was -- he was throwing up every

11  day.  Every 30 minutes Joe was in a corner, throwing

12  up; and he seemed to be crashing.

13          And, you know, I told Lauren -- I said -- I

14  said, "I can either make an offer to buy the park or

15  we can wait and see if Joe succumbs and find out

16  what happens."

17          I -- I -- I didn't know under what authority

18  or whose authority would decide the next owner of

19  the park if Joe were to die; but I know that when

20  Joe went into Intensive Care, people were coming out

21  of the woodwork -- like, from other zoos -- almost

22  trying to step in and take over.  It was morbid.

23          And, you know, I kind of felt like I was

24  lurking like a vulture lurking over a sick, you

25  know, prey.  But it was -- it was kind of my

Jeffrey Lowe                                    May 1, 2018

Page 198

1    feeling -- is, "Let's -- let's hang this out.  Let's

2    hold out a little bit longer, continue to keep the

3    park solvent."  And I said, "Joe may just die on

4    us."  And --

5       Q    At what point in time during that period

6    from September 1 through December 31st, Mr. Lowe,

7    did you determine the park was insolvent?

8       A    When he gave me the list of bills and he --

9    he showed me the stack of shutoff notices and

10   electrical disconnection notices and, I mean,

11   even -- gosh, it -- it -- it seemed like every

12   electric bill, you know.

13      Q    And, so, that would have been in September,

14   then, correct?

15      A    All -- all through -- all through the

16   winter, you know, electric shutoff notices were

17   pinned to the doors or to the fences on a -- at

18   least every month.

19      Q    And, so, when he provided you that list in

20   September, is that when you, at least in your mind,

21   determined that you believed the park to be

22   insolvent?

23              MS. CHRISTIANS:  Object to --

24      A    I knew --

25              MS. CHRISTIANS:  -- the form.

Jeffrey Lowe                                    May 1, 2018

Page 199

1      A    -- that it was in trouble.  I mean, and --

2    and I also understood that seasonal businesses like

3    that park -- in Oklahoma, particularly -- you know,

4    Carole's got the advantage of being in a -- in a

5    tourist state; and Joe is stuck in the middle of

6    Oklahoma.

7            And based on what Reinke -- conversations

8    that I'd had with Reink about how much money was

9    generated during spring break and the summer, it

10   didn't necessarily scare me.  It didn't scare me

11   away, obviously.  And, like I said, I didn't need

12   this to be a cash-generating source of revenue for

13   me.  I just needed it not to cost me $100,000 a

14   month forever.

15     Q    (By Mr. Givens) During the time that you and

16   Lauren were spending the month there in December of

17   2015, did you gain an understanding of the lease

18   that was in place as between the landowners -- you

19   and Shirley -- and Garold Wayne Zoo?

20     A    I never saw it.  I'd just heard Joe make

21   reference that -- that his mom owned the land and

22   that the park leased the land from his mom.

23     Q    Well, and at that time -- December, 2015 --

24   you and Shirley owned the land --

25     A    I did.

Jeffrey Lowe                                    May 1, 2018

Page 213

1        A     I'd step up.

2        Q     -- you would step up and make the payment?

3        A     I would.

4        Q     And, again, we're still -- are we still in

5     the time frame where you're doing this so you would

6     have a place to house your cats?

7        A     Yes.

8        Q     All right.

9        A     And with the kind of -- always in the back

10    of my mind that if Joe did pass away, I was in a

11    pretty good position to take over the park.

12              (Plaintiff's Exhibit Number 3 marked for

13    identification and made part of the record.)

14       Q     (By Mr. Givens) Mr. Lowe, I'm going to hand

15    you what we'll mark as Exhibit 3 to your deposition.

16    And I'm going to hand it to you for your review, and

17    then we can discuss it a little bit.  Okay?

18       A     Okay.

19              MS. HINTZ:  Thank you.

20       Q     (By Mr. Givens) Just take a minute or two to

21    re- -- to read through that, if you would; and just

22    let me know after you've read through it.

23       A     What day is this?  Okay.  Okay.

24              MS. CHRISTIANS:  I just want to state

25    an objection to this exhibit to the extent that this

Jeffrey Lowe                                         May 1, 2018

Page 297

1   Schreibvogel?

2       A    No.

3       Q    The -- you said you sought legal counsel.

4   Was that with Ms. Sullivan?

5       A    Yes.

6       Q    Any other places you sought legal counsel?

7       A    No, not for that.

8       Q    With respect to the plans to form GWDG and

9   take over down there, did you prepare any

10  projections, business plans, pro formas, anything in

11  writing?

12      A    No.  I had no -- I had no possible way to

13  predict what the Oklahoma, you know, economy would

14  do other than my being there in the winter to -- to

15  observe it in the winter.  I had to trust that --

16  that the spring and the summer was as lucrative as I

17  was told it was.

18           But I saw no risk in having it open.  I knew

19  I was going to be there, regardless, with my animals

20  whether it was open as a zoo or just as a private

21  facility that wasn't open to the zoo.  But it was my

22  determination that if I'm going to be there and

23  employees are going to be there, that we might as

24  well keep it open to the public.

25      Q    Okay.  During the deposition today we've